Joynes, J.
The first ground of error assigned in the petition is, that the court allowed the plaintiff to give secondary evidence of the will and codicil of L&uisa Hunter, deceased, under which he claimed the land in controversy, when no sufficient ground had been laid for the introduction of such evidence.
The proof was, that the original paper containing the will and codicil of Mrs. Hunter was deposited, in 1864, with the clerk of the Circuit Court of the city of Richmond ; that the witness had inquired of said clerk at his office for said original paper; that said clerk, at the request of the witness, made search for the said paper, and reported that it had been lost out of his possession, and destroyed at the time of the fire in Richmond in April, *634 1865. The plaintiff then offered to prove, that in November, 1864, he had the said original paper admitted to probate in the Circuit Court of Richmond as the will and codicil of Louisa Hunter, deceased'; and that it was duly proved and admitted to record; promising to follow this up with proof respecting the loss and destruction of the record of probate corresponding to that already offered respecting the loss and destruction of the original paper. The defendant objected to all the evidence thus offered; but the objection was overruled, and the evidence admitted.
There is some confusion and want of certainty in the record in respect to the secondary evidence introduced. The copy first offered in evidence was one made several years before Mrs. Hunter’s death by the plaintiff, from the original will and codicil placed in his hands by her. No objection appears to have been made to this evidence at the time it was offered. Then follows, in the bill of exceptions, a duly certified record from the Orphans’ Court of the county of Washington, D, C., of the probate in that court of a duly authenticated copy of the record of the original probate in the Circuit Court of the city of Richmond. It is no where stated that this record, or the copy of the will contained in it, was offered, in evidence. I presume this was an oversight in preparing the bill of exceptions. When the plaintiff had introduced the evidence already stated, respecting the inquiry at the office of the clerk of the Circuit Court of Richmond for the original will, the record says, that he “ then offered to read to the jury, as evidence of the contents of the said original paper, the said copy hereinbefore inserted.” This seems to have referred to the copy made by the plaintiff from the original will, and which appears to have been already introduced and read to the jury. There does not appear, therefore, to have been any specific objection to the admission of the record of the Orphans’ Court of *635 Washington. But there was a general objection to the admission of any secondary evidence, and if the objection was Well founded, the secondary evidence previously introduced should have been excluded, though admitted without objection at the time.
It is objected, that the loss of the original paper and of the record of probate could properly have been proved, only by the clerk himself, and that the evidence of what the clerk stated to the witness was only hearsay, and therefore inadmissible.
In Cowen & Hill’s notes to Phillip’s Evid. vol. 4, p. 1223, the following passages occur in reference to the admission of secondary evidence. I omit the citations of cases: “ The rigor of the old common law rule has been relaxed in this respect, and the non production of instruments is now excused for reasons more general and less specific, upon grounds more broad and liberal, than was [were] formerly admitted. In general, the party should give all the evidence reasonably in his power to prove the loss. He is not bound, however, to furnish the strongest possible assurance of the fact. If any suspicion hangs over the instrument, or that it is designedly withheld, a rigid enquiry should be made into the reasons of its non production. But when there is no such suspicion, all that ought to be required is reasonable diligence to obtain the original. In practice, where there is no ground of suspicion that the paper is intentionally suppressed, nor any discernible motive for deception, the courts are extremely liberal in regard to secondary evidence. The rule must be so applied as to promote the ends of justice and guard against fraud and imposition. If the circumstances justify a well-grounded belief that the original paper is kept back 'by design, no secondary evidence ought to be admitted; but where no such suspicion attaches, and the paper is of that description that no doubt can arise as to *636 the proof of its contents, there can he no danger in admitting secondary evidence. Ordinary diligence in ordinary cases is enough. Where the proof of loss adduced establishes the fact with reasonable certainty, nothing more is required. Evidence, which induces a fair presumption of loss is enough. No other than circumstantial evidence of loss can generally be expected; it will, therefore, usually suffice that the paper has been sought for, where it might be supposed likely to be found, or was usually kept, and that the search was fruitless.” The same general doctrine is laid down in other cases of subsequent date to those cited by Cowen & Hill, of which I will cite only two. In United States v. Sutter, 21 How. U. S. R. 170, the Supreme Court holds this language: “We agree that the rule of law which requires the best evidence within the power or control of the party to be produced, should not be relaxed, and that the court should be satisfied that the better evidence has not been wilfully destroyed nor voluntarily withheld. But the rule on the subject does not exact that the loss or destruction of the documents of evidence should be proved beyond all possibility of a mistake. It only demands that a moral certainty should exist that the court has had every opportunity for examining and deciding the cause upon the evidence 'within the power or ability of the litigants.” In Brigham & al. v. Coburn, 10 Gray’s R. 329, the plaintiffs claimed as assignees of one Bass, an insolvent debtor. The original deed of assignment was not produced, and to authorize the introduction of secondary evidence, the affidavit of one of the plaintiffs was filed, which stated that he had made diligent search for the deed of assignment, and could not find it, and that it was not, to his knowledge, recorded in the registry of deeds. The court held that secondary evidence of the deed was properly admitted. The court said: “We cannot perceive that the afiidavit, from the statement of its contents in the *637 exceptions, did not'raise a reasonable and legal presumption of the loss of the deed, according to the established rules of evidence. The question what is due enquiry for a deed or other document, in order to admit secondary evidence of it, must be decided upon the particular circumstances of the case in which that question arises.” Miller v. Miller, 1 Hodges R. 187; 2 Phil. Ev. (N. Y. ed; 1849) 229, 230. “ In ordinary cases,” says Mr. Earon Alderson, “ you do not make search as for stolen goods. The court must be reasonably satisfied that due diligence has been used; it is not necessary to negative every possibility—it is enough to negative every reasonable probability, of anything being kept back.” McGahey, v. Alston, 2 Mees. & Melsb. R. 206.
Upon the evidence in this case, it is impossible to entertain a suspicion that anything has been suppressed or withheld, or that the copies which were given in evidence are not true copies of the original will and codicil. Enquiry was made of the clerk, at his office, for the original will and codicil, and also for the record of the probate. It is fair to presume that these enquiries were made for the purpose of obtaining a copy in the regular and usual way. And certainly nothing could be more satisfactory to the mind, if legally admissible, than the record of the Orphans’ Court of Washington. The papers admitted to record in that court were duly authenticated by the clerk of the Circuit Court of Richmond, where they were admitted to probate, as copies from the records of his court. The Register of Wills certifies, in due form, a copy of the papers thus authenticated by the clerk of the Circuit Court. The copy sent from Richmond is filed in the Orphans’ Court, and cannot, therefore, be obtained. An authenticated copy of it is the next best thing, and carries as full conviction to the mind of its authenticity, as would a copy from the clerk of the ^Circuit Court of Richmond. *638 The court will not, therefore, according to the authorities which have been cited, require that the loss or destruction of the original papers, and of the probate of them, shall be “ proved beyond all possibility of mistake; ” it is only necessary that the evidence in relation to the loss should produce “ a moral certainty that the court has had every opportunity for examining and deciding the cause, upon the best evidence within the power or control of the litigants.” This “moral certainty ” is produced in this case by the evidence as to the application to the clerk of the Circuit Court of Richmond. It was his official duty to preserve the original papers and the record of their probate, and to furnish copies when applied for. The evidence is not merely that the clerk declared that the paper and record had been lost or destroyed at the time of the great fire; but at the request of the witness he made search for them, and reported, then and there, as the result of the search, that they had been lost. The search seems to have been made in the presence of the witness. At any rate, it was made, and the result reported, and the declaration of the clerk accompanies, and formed part of, an official act. We must presume, in the absence of any evidence to raise a suspicion of the contrary, that a declaration thus made was true. It was not only the duty of the clerk, but his interest also, to find the paper and record, and to furnish a copy, if they were in existence. The testimony of the clerk as to the particulars of his search, and as to the facts connected with the fire, would have gone a step further to exclude the possibility of a mistake, and might properly have been insisted on, if there had been room to suspect that anything had been “kept back ” by design, or that the copies actually produced were not genuine. In the case cited from 10 Gray’s R. 329, the affidavit of the other plaintiff would in like manner, have gone a step further to exclude the possibility of *639 mistake as to the loss of the deed; but there being no ground of suspicion, the court did not require it. In Waller v. School District, 22 Conn. R. 326, the court said: “ The only ground of complaint is, that the plaintiff’s son was not called to testify as to the loss. His testimony would have rendered the evidence more satisfactory, and ought to have been required, had there been any reason to believe there was any collusion between him and the defendants. ■ But nothing of that kind appears.”
I conclude, therefore, that a sufficient ground was laid in this case for the introduction of secondary evidence. The plaintiff was under no obligation to avail himself of the provisions of the act of February 21, 1866, to establish the lost record. The provisions of that act are only cumulative. Smith v. Carter, 3 Rand. 167; Newcomb v. Drummond, 4 Leigh 57.
The next ground of error assigned, is the admission of the record of the county court of Alexandria of a probate of a copy of the bill certified from the Orphans’ Court of Washington. The ground of the objection is, that the county court had no jurisdiction to admit the copy to probate, because the original will had already been admitted to probate in Richmond, and that the case is not embraced by the provision of ch. 123, section 26, of the Code; and that as the defect of jurisdiction appears on the face of the proceedings of the county court, its act was void and not voidable merely.
But conceding this to be so, I think that the admission of this evidence affords no ground for reversing the judgment. If, according to the doctrine in England, there are no degrees in secondary evidence, then this evidence was admissible on the same ground as the other secondary evidence. But even if that is not so, it is obvious that the admission of this evidence could do the defendant no injury. The record of the Orphans’ Court of Washington *640 was already before tbe jury, which was the best secondary evidence attainable, and the record of the county court only brought this record of the Orphans’ Court before the jury a second time. The same views apply to the objection made to the admission of the copy of the original will made by the plaintiff, upon the assumption made by the defendant that two witnesses were necessary to authenticate that copy.
The next ground of error assigned is, the admission in evidence of the certificate of redemption. The objection is, that the land was redeemed by McPherson, who was a stranger to the land, and had no right to redeem it under the act of Congress. . Before this certificate of redemption was offered by the plaintiff, the defendant had introduced the record of a suit in chancery in the Supreme Court of the District of Columbia, instituted for the purpose of appointing another trustee under the bill of Mrs. Hunter, in the place and stead of the plaintiff, and in which the court made a decree appointing McPherson as trustee. It is conceded, in the petition, that the court of the District of Columbia had no authority to remove the plaintiff from his trust in respect to the land in Yirginia, or to constitute McPherson trustee in respect to said land.
The seventh section of the act of Congress, passed June 7, 1862, as amended by the act of February 3, 1863, provides that when land has been sold by the Commissioners, “ the owner of said lots of ground, or any loyal person of the United States, having any valid lien on, or interest in the land, may, at any time within sixty days after said sale, appear before the said Board of Tax Commissioners, in his or her own proper person, and, if a citizen, upon taking an oath to support the Constitution of the United States, and paying the amount of said tax and penalty,” &c. * * “ may redeem said lots of ,land from said sale, and any purchaser under the same having *641 paid moneys, treasury notes, or other certificates of indebtedness of the United States, shall, upon such redemption being made, be entitled to have the same, with the interest accruing after said sale, returned to him by the said Commissioners, upon surrendering up the certificate of sale. And provided further, that if the owner of said lots of ground shall be a minor, a non-resident alien, a loyal citizen, beyond seas, a person of unsound mind, or under a legal disability, the guardian, trustee, or other person having charge of the person or estate of such person, may redeem the same at any time within two years after the sale thereof, and in the manner above provided, and with like effect.”
This provision distinguishes those who are entitled to redeem into two classes, one of which is required to redeem within sixty days after the sale, and the other of which is allowed to redeem within two years. The owner, of either class, must appear before the Commissioners in proper person, and, if a citizen, must take an oath to support the Constitution of the United States. The first class embraces persons who are resident and sui juris, and whom Congress designed to hold to a strict responsibility for their acts and defaults, and as to whom it restricted the privilege of redemption within narrow limits. The other class embraces persons under disability, non-resident aliens and loyal citizens beyond seas, who could not justly be held to the same strict responsibility, and to whom Congresá designed to extend the privilege of redemption on more liberal terms. The persons described in this second class are such that their lands, in consequence of their non-residence or disability, would generally be in the “ charge ” of some other person. Hence the act, in terms, gives the privilege of redeeming, within two years, to “ the guardian, trustee, or other person having charge of the person or estate ” of the owner. But *642 the plain intention of the act was to secure the privilege of redemption to the owner, to whom no fault could he imputed, and for whose benefit the redemption was to be made. Suppose the land of a non-resident alien, or of a loyal citizen beyond seas, is not in the charge of any agent or other person—might not the owner redeem through the agency of a friend, deputed for that purpose only? Or, might he not, upon coming home -within the t-wo years, redeem in proper person ? Or suppose a minor has no guardian, and neither he or his estate is, in any legal sense, or actually, in the charge of any other person, as may well be the case if he manages his own affairs and controls his own actions—is he to lose the privilege secured for his benefit, because the literal terms of the act cannot be complied with 1 It seems to me that this would be putting too strict a construction upon the act of Congress. It would destroy the sense and object of the law, in order to satisfy its letter. The rule is, that laws allowing redemption are to be construed liberally. Blackwell on Tax Titles, Ed. 1864, 432.
I think, therefore, that Mrs. Featherstonhaugh and Mrs. Young, the beneficial'owners of the land, had the right to redeem in their proper persons, and that they must be understood to have done so in this case. The Commissioners appear to have so understood it, for they ’administered to those ladies the additional oath required by the act of March 3, 1865, sect. 7, w'hich is to be taken by every “ owner ” who redeems. The certificate describes them as the owners, though it describes McPherson as the trustee. There is some ambiguity in the certificate as to whether these ladies took the oath to support the Constitution of the United States. It does not appear that they did not take this oath, as well as the other; and the language being ambiguous, we may presume that they, as well as McPherson, took this oath, in order to sustain the cer *643 íificate, ut res magis vale at quam per eat.” If they did not, why was not the additional oath, required by the act of March 3, 1365, administered to McPherson, as well as to them ?
But perhaps the true construction of the certificate is, that McPherson alone took the oath to support the Constitution of the United States, and that Mrs. Eeatherstonhaugh and Mrs. Young alone took the other oath required by the act of March 3, 1865. That would be in accordance with a strict and literal construction of the acts of Congress. The act of 1862, and the amendment of 1863, require that the person who redeems as guardian, trustee, or person having charge of the property or person of the owner, shall take the oath to support the Constitution. The act of March 3, 1805, provides that “no owner” shall redeem without taking the additional oath prescribed by that act.
Assuming this to be the true construction of these acts, .the question is, whether the redemption was invalid for want of proper authority in McPherson. He was not, strictly and legally, the trustee of these ladies in respect to the land to be redeemed, because the jurisdiction of the court which appointed him did not extend over that land. But no doubt both he and they thought he was the trustee in respect to these lands, as undoubtedly he was their trustee in respect to other property. He may, too, for aught that appears, have been acting under this impression, and been actually in “ charge ” of all the trust property. In making the redemption, he acted for these ladies, and with them, and professedly as their trustee. He was not an intruder or volunteer. And the Commissioners, whose duty it was to ascertain his relation to the property, recognized him as a person who had a right to redeem. Every substantial purpose of the act of Congress was, therefore, fully satisfied; and considering that an act allowing *644 redemption is to be construed liberally, so as to promote the beneficent intention of the legislature, and not strictly, I think we are fully authorized to hold that the redemption in this case was valid and effectual, as a redemption by McPherson.
It seems that the same construction was put upon this provision of the act of Congress by the Supreme Court of Tennessee, in the case of Galbraith v. McFarland, 3 Cald. R. 267, and by the Court of Appeals of South Carolina, in Pope v. Chaffin, noticed in Amer. Law Review, April, 1868, p. 578.
The next error assigned is the refusal of the court to give the instructions moved by the defendant.
The first instruction proceeds on the assumption that the devise was void under the 6th section of the act of Congress passed July 17, 1862, entitled “An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes.” This section declares, that if any person engaged in armed rebellion against the United States, or aiding or abetting such rebellion, shall not, within sixty days after public warning and proclamation duly made by the President, cease to aid, countenance, and abet such rebellion and return to his allegiance, all the estate of such person shall be subject to seizure, and it shall be the duty of the President to seize the same as before provided in the act; and that “ all sales, transfers, or conveyances of any such property, after the expiration of said sixty days from the date of said warning and proclamation, shall be null and void; and it shall be a sufficient bar to any suit brought by such person for the possession or the use of such property, or any of it, to allege and prove that he is one of the persons described in this section.” The 5th section of this act provides that “ to insure the speedy termination of the present rebellion, it shall be the duty of the Presi *645 dent of the United States to cause the seizure of all the estate and property, money, stocks, effects and credits” of the persons thereinafter named, “ and to apply and use the same and the proceeds thereof for the support of the army of the United States.” After enumerating the several classes of persons whose property is thus liable to seizure, the section concludes as follows : “ And all sales, transfers, or conveyances of any such property shall be null and void, and it shall be a sufficient bar to any suit brought by such person for the possession or the use of such property, or any of it, to allege and prove that he is one of the persons described in this section.” The 7th and 8th sections make provision for the condemnation and sale of the property thus liable to seizure under the 5th and 6th sections.
It is obvious from the provisions of this act, that it was designed as a war measure, and the 5th section expressly declares that the seizure of property which it authorizes is provided “ to insure the speedy termination of the present rebellion.” The act proposed to aid this object by the seizure and confiscation of the property of certain classes of persons described, and of all others who should disregard the proclamation of the President provided for in the 6th section. The provisions of the 5th and 6th sections making void all sales, conveyances, and transfers of property declared liable to seizure and confiscation, must be construed with reference to the objects and general provisions of the act. They were necessary to prevent these objects and provisions from being defeated by the sale, conveyance, or transfer of property, before seizure, by persons embraced in the described classes. The object was to provide, that no sale, conveyance, or transfer should interfere with the seizure and sale provided for by that act. This construction satisfies the terms of law, the and is consistent with its policy. To carry its operation to *646 the extent contended for by the counsel for the defendant, is not necessary to accomplish the objects of the act; is not necessary to satisfy the fair meaning of the language; and imputes to Congress a purpose for which no good reason can be assigned, and which can hardly be sustained upon any construction of its powers. If the construction contended for is right, then the other provision that no person embraced in the described classes shall be allowed to maintain a suit for the possession or use of any property made liable to seizure, must be held to be a perpetual bar, until the act is repealed, to a recovery in any such suit.
The court properly refused to give this instruction.
The second instruction asked for declared, that if the jury should believe from the evidence that the plaintiff was removed from the office of trustee, and McPherson substituted as trustee in his stead, by a decree of the Supreme Court of the District of Columbia, then the plaintiff was not entitled to recover.
The court was justified in refusing this instruction, on the ground that it proposed to submit to the jury, as a question of fact, what was properly a question of law for the court. Whether the plaintiff was removed or McPherson substituted as trustee, in respect to the land in controversy in this suit, depended upon the construction and legal effect of the decree of the Supreme Court.
This instruction proceeds on the assumption, that it was competent for the court of the District, by the mere force of its decree, to operate upon the title to land in Yirginia, so as to divest it out of Nutt arid to vest it in McPherson. This cannot be maintained, and the instruction was properly refused for that reason. See 1 Rob. New Pract. 336-343; Story Confl. § § 544, 545; Watkins v. Holman, 16 Peters R. 25; McLawrin v. Salmons, 11 B. Mon. R. 96.
The petition treats this instruction as involving the *647 question, whether Nutt made or could make a valid disclaimer by parol of the estate devised to him by Mrs. Hunter. But certainly it involves no such question. That question may be raised under the exception to the refusal of the court to grant a new trial, though no error has been assigned on that ground.
The bill in the case in the Supreme Court of the District alleged that Nutt, the plaintiff, declined to accept the trusts conferred upon him by the will of Mrs. Hunter, and asked the appointment of another person to execute the trusts in his stead. Nutt, in his answer, admitted that he had declined to accept the said trusts. It is insisted that this answer is proof of a parol disclaimer by Nutt of the title to the land in controversy, and that the effect of such disclaimer was to divest the title out of him.
Whether an estate of freehold in land can be effectually disclaimed by parol, so as to divest the title of the-devisee, has not been settled by the decisions of this court. In Bryan v. Hyre, 1 Rob. R. 94, it was conceded that the question did not arise. The case cannot be regarded, therefore, as settling the question against the validity of such a disclaimer, though the opinion of Judge Allen is said by the report, in general terms, to have been concurred in by the other judges who sat in the case. .It is not necessary to determine that question in this ease. If we assume it to be true, as contended for, that a freehold estate in land may be disclaimed by parol, the question remains whether such disclaimer is proved in this case, in respect to the land in controversy. That depends on Nutt’s intention. His answer does not specify the, particular trusts which he had declined. A large amount of property, real and personal, had been devised and bequeathed to him in trust, all of which seems to have been in the District of Columbia, except the sixty acres of land in controversy in this suit. The bill to which the *648 answer was made was filed in the District, in a court which had no jurisdiction over the land in Virginia. It was for the jury to say, upon the answer and all the other evidence, whether Nutt had made a disclaimer of title to the land involved in this suit. The fact that he subsequently instituted this suit, was a fact which they might consider in making up their opinion on this question. The verdict finds, in effect, that Nutt had made no such disclaimer in respect to this land. We cannot say that the verdict should be set aside on that ground. This view is sufficient to dispose of the question of a parol disclaimer, without adverting to any other.
The next instruction asked for affirms that the writ of unlawful detainer is not an appropriate remedy in this case. The reason assigned in the petition is, that the title alone is involved. This instruction too was properly refused. The Code, ch. 134, section 1, gives the remedy of unlawful detainer where there has been an unlawful entry upon land, or where the entry having been lawful, the tenant detains possession of land after his right has expired, without the consent of him who is entitled to the possession, and where such unlawful possession has not continued for three years. The controversy in such a case, though it determines only the right of possession, may turn altogether upon the validity of' the title under which the defendant claims to hold the possession.
The only remaining instruction asked for affirms, that to entitle the plaintiff to recover, he must show that the certificate of redemption was forwarded by the commissioners to the Secretary of the Treasury, and that the purchase money was refunded to the defendant by a draft on the Treasury of the United States. This proposition is based on the 7th section of the act of March 3, 1865, which provides, “that in any case in which lands shall be redeemed after sale made by the hoard of commissioners, *649 and after the money received by them on the sale of such lands has been paid into the treasury, by the owner complying with all the provisions of the law relating to redemption necessary to be complied with on his part, the said board shall certify to the Secretary of the Treasury the fact that such lands have been redeemed, the amount of the purchase money paid by the purchaser, and when said purchase money was paid, together with such other circumstances as the Secretary, by general regulations or special instructions, shall require; and the Secretary, on being satisfied that the lands have been duly redeemed, shall repay, by draft drawn on the Treasury of the United States, the said purchaser the principal and interest of said purchase money; and the purchaser shall forthwith deliver possession to the owner so redeeming as aforesaid.”
This provision was designed for the benefit of the purchaser, so as to enable him to obtain the repayment of the money, after it had been paid by the commissioners into the treasury. The act of February 3, 1863, already quoted, made provision for the commissioners returning the purchase money where it remained in their hands at the time of the redemption. But the validity of the redemption did not depend upon the return of the purchase money. And so in cases where the money is paid into the treasury, it is not necessary for the party claiming under a redemption, to show that the money has been refunded to the purchaser. If the refusal of the Secretary to refund the purchase money would entitle the purchaser to withhold the land, that would be matter of defence to be proved by him. But the law does not make the Secretary a judge to determine the validity of the redemption, as between the former owner and the purchaser. He is only to revise the certificate of redemption for the purpose of deciding whether the money shall be withdrawn from the treasury. If the owner has made *650 redemption in the manner required by law, his title is complete, even though the Secretary should refuse to do justice to the purchaser by refunding the purchase money.
Upon the whole, I think there is no error in the judgment, and that it ought to be affirmed.
The other judges concurred in the opinion of Joynes, J.
Judgment appirmed.